Number 17-1190. Mr. Peterson. Good morning. May it please the court? I'm John Peterson and with my co-counsel Richard O'Neill, we represent Pleasure-Way Industries. The question in this case is whether the merchandise that Pleasure-Way re-imported into the United States qualified for entry under the repair or alteration provision of the tariff. Now Pleasure-Way buys finished Daimler Chrysler Sprinter vans from dealers in the United States. These vans are ready to go. They're warrantied. They have a vehicle identification number that identifies them as finished vehicles. Pleasure-Way then takes these into Canada where it up-fits the cargo compartment of the vans and it turns them into Class B motorhomes. Now if you see one of these things driving on the road, and we've all seen a Sprinter van, the Class B motorhome won't look any different from the outside. From the inside, it will have things in the cargo bay that will be fitted there. There'll be a bed, perhaps a television, a rudimentary sink, a washroom. There were windows and things in the original car? Pardon? There were windows and stuff like that in the original car? Pretty much the same. They may put some windows on it, but the body, the wheelbase, everything is maintained. When you said you wouldn't see any difference if you saw the two going down the street, if one had a bunch of windows and the other was a flat panel, it would look different? Right, you would see some windows on the van, but, you know, these are sort of relatively minor changes. How big are the windows? Pardon? How big are the windows? I think they put windows on the side, I think two. Picture windows? Pardon? Picture windows and enjoy what you see. They're wide windows. They run most of the length of the van, as I recall. They're depicted in the appendix on page 284, so they're relatively, maybe, windows going along. The hole, that's what I thought. Yeah. The hole in the van, the window was added in Canada. Yeah, added in various accoutrements were put into the cargo bed so that, you know, people use these vans. Question of fact, whether or not they look the same? Yeah. Well, I mean, people use cargo vans to take various things around with them. You can use it for loose packages, you can put a tool rack in there and use it as your professional carpentry or electrician van. And in this case, people put sleeping and living accommodations, and that's the cargo, if you will, that they drag around with them or travel around with. Now, the Court of International Trade denied us repair and alteration treatment for two reasons, and we think they were both in error. First, the court said... Can you focus on the commercially different good element requirement? Which element? The commercially different good. It seems to me that putting completely to one side this intended use and essential characteristics debate... Okay. ...that, let me, I guess, present the challenge. Why isn't it a quite straightforward conclusion that the Class B motorhome is a commercially different good from the cargo carrier? Well, a couple of reasons, Your Honor. First of all... See, if it's twice the price, people are basically using it for commercially different purposes, et cetera. I mean, they're... Well, they're not really even using them for commercial purposes. They're using them for personal purposes. Okay, so that would be commercially different from the cargo van use in the sense of cargo that's not going to be used inside the van but going to be carried around for use taking in and out. Well, the question is, there, have we created a new and different article of commerce? And the answer is no, because the important thing to understand about the repair and alteration statute, it's not really a classification statute. It's an identification statute, and a good part of its purpose is to avoid double taxation, so that if we have a finished article that we export from the United States, and we upgrade it overseas, and we bring it back, the question that this statute asks is, is this product coming back recognizable as the thing that left? And if it is, we will assess duty on the value of the upgrades overseas, but not on the value of the original thing that left. And it's a presumption that the article that left the U.S. I mean, that's glass things. They go abroad as a glass. They come back as glass. It sort of depends on how granular you are. Are you really throwing your eyes completely out of focus? If you throw your eyes sort of seminally out of focus, these two vans kind of look the same. And they, right? Okay. But if you drill down and look at them, like, for example, in the degree of viewing for the commercially different vehicle, as the presiding judges pointed out, the key facts are very different. Yeah. Well, I think what Your Honor is getting at is a little bit more to the question of is it identifiable as a finished article when it leaves, and from what perspective do you determine that? Now, in the case of the annealed glass, the company that exported that product to Canada was looking to make annealed glass. So their intention was to make annealed glass. The article leaving the United States was not annealed, so it was not a finished article. Let me interrupt. The example that is given about the glass mugs specifically says that the foreign operations here, it's the etching and tempering operations, exceed the scope of an alteration because they are manufacturing processes which create commercially different products. So I don't actually view that as maybe having anything to do with, but certainly as not limited to the intended use concept, a concept that presents a perfect ambiguity about whose intent counts. That's why it seems to me pretty straightforward to focus on the commercially different goods element of, I guess it's actually subsection A, not subsection B. If the etching and tempering create a commercially different good, why doesn't what your company does? In the case taken from the regulation, the really important operation was the tempering operation because the tempering operation is what created a finished mug, not so much the etching. So that really puts it in line with the Guardian Industries case, which I think Judge Clevenger was referring to. The mere etching or something like that into a finished product doesn't change it. And in our brief, we discussed this Jansport case, which involved T-shirts that were exported from the United States to be embroidered and returned. Now customs said, well, the embroidered T-shirt is a new and different article made in Mexico. The shirt leaving from Mexico was not a finished article. But then customs, on reconsideration, take a look at the Jansport catalog and said, oh, you can purchase both the non-embroidered and the embroidered shirt. So what they concluded was that the embroidered shirt wasn't a commercially different article. It qualified for repair and alteration. And they also concluded that the shirts, as exported, were finished goods because they were sold in the United States. The Jansport people alienated them. They would sell them that way. And the same thing is true here. We have a Daimler Chrysler van that is sold that way. What comes back, in terms of, you say, a commercially different good, what comes back is simply a Daimler Chrysler van that's been upgraded. It's sort of like a car that's been hot-rodded. Now, if you go out and you hot-rod a car, very often the original manufacturer will say, I'm not honoring the warranty. But in this case, what tells you that what's coming back is not a commercially different good is a couple of facts in the record. Number one, vehicle identification number is the same. The government recognizes this returned van as the same panel van it left. Yes, it's improved. Do hot rods change their vins? Hot rods may not change their vins, but they may be manufactured in such a way that the manufacturer will disclaim the warranty. Now, in this case, all of the repairs and alterations done in Canada were done according to a Sprinter body book, which Daimler Chrysler issued. And what they said was, if you do the repairs this way, and you're just changing. These are just repairs to the body. The drivetrain, the electronics, the transmission. Does Chrysler supply a warranty on the toilet in the van that will work when it comes back from Canada? I'm sorry? Well, I mean, you're talking about the warranty. When it comes back, there's all sorts of new things in there that aren't warrantied. Well, there's new things in there. Are they warrantied by anybody? Well, see, they're not covered. Do you warranty that the seats are good and all that sort of thing? Well, Pleasure Way has a separate warranty on whatever they put into the van. Daimler Chrysler warrants the article that was exported from the United States. Now, the fact here is sure. This product comes back in true. I'm not saying their different warranties suggest that the vehicles aren't the same coming back. No, no, no. Not at all. It's almost as if you said, okay, I have a car, and there's a warranty on the car. I am now putting something in the back of the car, or the truck as it were. I'm going to put a refrigerator in there. And a refrigerator has a separate warranty that comes from its manufacturer. So now, when the truck returns to the United States, there's two warranties there. One is a warranty on the truck issued by Daimler Chrysler in this case. The other might be a warranty from the refrigerator, either issued by the refrigerator manufacturer or the person who installed it. So I don't think that meets a different product. I noticed in the record that all the duties that were charged to you in Canada were refunded. This is at A39 in the record. And it says refunded either through drawback claims or reclassification refunds. Were the goods reclassified by Canada? I don't recall, Your Honor. I do know that they were. I don't believe they were reclassified. I believe they may have qualified for what they call a Chapter 99 duty exemption in Canada. But that is not. What are reclassification refunds? Canadian refunds, and they don't have anything to do with it. As a result of reclassification, the goods that were classified going into Canada, right, is sort of as more? Oh, I believe Canada provides a duty abatement for articles that are used in manufacturing operations. And so I think when some of these vans initially entered Canada, they were assessed with Canadian duties. Those duties were subsequently remitted because the operations Pleasure Way were doing were considered to be manufacturing operations. Under that statute, but totally irrelevant to the United States statute. What the United States statute provides is that if you export the van with benefit of drawback, you don't get repair and alteration treatment on the way back. Yeah, what I was getting at is my understanding in the record was that the goods, the vans going into Canada were considered by Canada to be motor vehicles designed for the transport of persons. Right. And what I'm trying to get at is whether or not there was a reclassification coming back. I think coming back to classified as by the United States as articles for the transport of persons, I believe, or perhaps transport of goods. But here's the thing about the four factors that the Court of International Trade wrote on. The Court of International Trade said the essential characteristics of these vans were destroyed in four ways. Price, tariff classification, use, and name. They disregarded every physical aspect of these vehicles. They didn't look at identification. They didn't look at whether they were the same vehicle. Now, those four factors are not identifying characteristics. They're not essential characteristics. Why don't they define the commercially different or same nature of the good? Take them one at a time. Price makes no difference. Let me just focus on this. I think I have an intuition about what commercially different means. It has something to do with the market in which it is being sold and who's buying it and for what purposes. As soon as you say the words essential characteristic, you get into something that is rather abstract. As soon as you say intended use, you have to say, oh, intent is a mental thing. Whose intent is it? Daniel or Chrysler's intent? Your intent? Whose intent? Those are problematic. Commercially different is a pretty familiar notion about what's happening in the marketplace. Well, I think what it is, Your Honor, I think it's a question of identification. The case I think this Court needs to look at, its precedent, is the Dolev case. And in the Dolev case, this Court rejected every one of the factors that the lower court looked at as disqualifying something for repair and alteration. And from the Dolev case, this Court said, to hold that alterations cannot change the name, character, size, shape, and use of an article unreasonably restricts this provision. And in Dolev, they also spoke of the irrelevance of common classification. I think part of the problem here, Your Honor, is that I think people are thinking too hard here. This is not a question of abstractly classifying a good. This is not even a question of whether we have manufactured a good, because manufacturing is expressly allowed under 9802. The only question here is whether we can identify the motorhomes coming back in the United States as being or incorporating the articles that were exported from the United States. And if so, then the value of the article exported from the United States is not subject to tax. And the value of all those improvements is. Whether you think the improvements give the product a new use, an enhanced value, or other characteristics, obviously a higher price. This Court in the Dolev case said all of that is irrelevant. Can I ask you a legal question? The presiding judge has pointed out that there are more than one test in Section 181-64. Right. So you have a plurality of tests to decide whether or not the duty-free treatment will be granted. In order to flunk, that is, to lose the duty-free, do you have to flunk all the tests, or is just one enough? I think you have to flunk all the tests. Why is that? Because I think, as I said, it's a matter of identification. I mean, to start off and say, for example, that I agreed with, say the question was simply whether commercially different was met. And I say, no, no, it is commercially different. So you flunk that test. What happens if I, do I have to then go on and decide the intended use? And the other issue? Well. And that's, the question coming from the bench suggested that flunking one would be enough. Well, no, I think you have to flunk them all. If you look at the Dolev case, it talked about five different characteristics. To go with what Judge Toronto said. What about the language of the regulation itself? It talks about it must not destroy the essential commercially different good from the goods. It must not destroy the essential characteristics of the good from the United States or create a new or commercially different good. Why aren't those two different requirements, either one of which, if not satisfied, doesn't allow the imported good to fall into the repair or alteration statute? Once again, I think it's an identification test. And the question is, what are you going to use to say something's commercially different? Judge Toronto said, if somebody is going to use this to carry around their possessions instead of other type of cargo, that would be, in his view, a new and commercially different use. However, this court in Dolev said a change in use doesn't disqualify. And the test from Dolev is no different from the test today. I don't think you're answering the question. Pardon? I don't think you're answering my question. I thought that you were saying that, you know, in the regulations, there's part A that talks about destroy the essential characteristics of the good. Right. And then there's another regulation, part of that same regulation, that says create a new or commercially different good. Those are two different requirements, right? You could conclude if the goods don't satisfy either one of those, then they're not satisfying the repair or alteration statute, right? Correct. But in terms of commercial difference, the court has to say what constitutes a commercial difference. And if it's just a difference in the use, if you're saying, well, I used this to carry loose packages. Now I'm using it to carry a bed. That's not, I think, an appropriate test to say that's a new and commercially different article of commerce. Because if you say that, then you could probably take any even minor alteration and say, oh, that makes it for a different use. Okay. I have a truck to carry stuff around in. I put in some racks to put my tools on. Now it's a tool truck. Is that a new and commercially different use? No. It's still a truck. A truck can be used for multiple things. You've gone over even your rebuttal time. We'll restore two minutes for the rebuttal. Good morning. May it please the court. The trial court's decision should be affirmed because, as this court pointed out, exported cargo vans and the imported motorhomes are commercially different goods. And just to be clear, my understanding, and tell me if you agree or disagree, under the regulation 181.64a says here are a variety of things that you cannot be in order to get the benefit of this. One of them that you cannot be is a commercially different good. B says there's a further exclusion. A further exclusion. It's not an alternative. It doesn't add back something in that was already removed by A. Yes. Okay. And of the various determinations made by the Court of International Trade, which ones are factual and therefore subject to clear error review here, and which ones are subject to de novo review? In this case, in terms of applying the statute and applying the ultimate classification, our position is everything is subject to de novo review. There were no facts at issue. So the court can actually look at the facts that everyone agreed to and determine whether the motorhomes meet subsection A. And I would agree with the court. I'm not sure we even have to go to subsection B if we are stopped at subsection A. Just to make sure I understand what you're saying, is it because there's no dispute about what the goods were like when they were exported into Canada and then what they were like when they were imported back into the U.S.? Because there's no dispute about what those goods were, the issue collapses into one of law. Yes. The only dispute now is just whether the motorhomes satisfy the section 181.64A. And we say A, but A and B. So it's a question of law. So the judge gets to decide if they're commercially different goods? Yes, the judge. As a matter of law. Yes, absolutely. But don't facts have to drive that decision? Yes. In the classification area of the law, we generally do have cases where we do agree on all the facts and the classification collapses into a question of law. This is really no different. It's just one step further. So you're saying they all agree, for example, that the price is different between these two products? Yes, it's in the record. And they would all agree that the use is different? Yes, the use is different between the cargo vans and the – well, we contend the use is different, but if you actually look in the record, the use is different. There's evidence in the record that the motorhomes are used for sleeping accommodations. That's undisputed. And it's undisputed because it's actually in the deposition testimony that they sell the motorhomes for temporary residential accommodations. The cargo vans are cargo vans. They're meant to transport cargo. So nobody can put a mattress in there and sleep? Yes, absolutely. So the hippies are happy to go around. You can put a mattress in there and sleep, but this was more than just putting a mattress in and sleeping. This was actually putting in a kitchen – putting in a kitchen, recliner beds, television, bathroom with a shower, outside awning, outside shower. So the hippies have a sound – they've got a boom box and a few other things in here? Yes, they could, but this is – again, this is – and plus, those items actually are – those items are actually removable. If you take your boom box – Seems like we're getting pretty factual. Now, if you take your boom box out and you take your mattress out, you still have a cargo van. These are permanently placed inside the motorhomes, and they can't be removed. They're meant to stay in, so we no longer have a cargo van. So it's a bit different than the boom box and the mattress. The other thing I wanted to – we wanted to address was that this is not a case of identification. There's no dispute that the chassis on the motorhomes are the same as the chassis from the cargo vans, so that's not in dispute. You seem to say that subsection A has the main test and B has an additional test, so you don't have to meet B if you flunk under A. A has two tests. One is destroy the essential characteristics, and the other is create a new or commercially different good. Now, those two tests are stated separately, so they're not the same, right? Yes, A does have two tests. And are they different? The way they're stated, they're different, but I think when you're actually going to determine whether something's commercially different, you can actually look at the – Well, this is a matter of interpreting the regulation. Yes. My question is, does A have one test or two? The way it's written, it has two tests. The way it's written. And should I presume they're different because they are stated as two different tests? Yes, you can presume that they're different. Okay, so what happens if it passes one test and flunks the other? Then it's not – whatever processes are done – Well, for example, let's say, for example, I decided that this was a new and commercially different good as a matter of law. But as a matter of law, I decided that the essential characteristics were not destroyed. Then what's the answer? Duty-free or not? If it's a new or commercially different good, it doesn't get duty-free treatment. No, but if I say – what I'm trying to decide, the regulation is giving us a really sort of a fun but rather ambiguous or odd way of deciding whether something has either been repaired or altered, right? Yes. That's the question. So what happens if you take a particular good and you say, yep, it was altered? And then you say, no, it wasn't. Then how do you know how to duty it? Because you say, well, yes, its essential characteristics were not destroyed, so it was altered, but it's a new article, altered. If it's a new commercial good, it doesn't qualify. Even though its essential characteristics were not destroyed? Yes. How can that be? I can't think of a good in my mind that would satisfy that, but I'm looking at the language. Well, you told me it's a question of loss. The way the statute reads, it's processes which essentially does not destroy. The essential sort of goes to the essence, the essence, and the essence of this thing is a vehicle that goes around on four wheels. Yes. And is capable of carrying things. And the fact that you go granular and say, well, it's carrying a family and children as opposed to a bunch of boxes, but is that essential? I would respectfully disagree if that's granular. I would think that, in my opinion or in the government's opinion, that that's actually not granular, it's essential. Because in terms of looking at vehicles, the use of the vehicle, we don't look at the drive train or the way it drives things around. We look at what's the use of the vehicle, and that's granular, that's essential. Here, the use of the vehicle was a cargo van before and after the use of the vehicle as a motor home. So from our perspective, that's essential. And just on the textual point, I gather your point is this says that this cannot either destroy the essential characteristic or create a new commercially different good. So if it does either one of those, it flunks. Yes, that's what I was trying to get at. Yes, thank you. And in this case, as the court pointed out, the van, the motor homes actually are new and commercial different goods, but they also flunk the other part of the test where the essential characteristics were destroyed. The cargo van, the ability of the van to carry the cargo is now gone. It's nothing in there but now living accommodations. The other thing I wanted to mention was that the warranty issue. The warranty is solely on the chassis. It's not on the actual motor home. The actual thing that changed in Canada, an actual thing that gives that motor home its character, it defines what it is. And that actually has a separate warranty, and that's a warranty from Pleasure-Way. And I want to note that Pleasure-Way actually treats the motor homes as different commercial vehicles. They don't call it a sprinter. Pleasure-Way calls it the motor homes plateaus in a sense. Its marketing material refers to it as motor homes. The documentation refers to it as motor homes. It doesn't refer to it as cargo vans, and they also give a coach of VIN to it. So it's not just cold record. Pleasure-Way itself considers the motor homes different from cargo vans. Can I ask you this question? Your brief, I think it is fair to say, tell me if I'm wrong, concentrates on the intended use element. And is there some practical real-world difference in effect of deciding the case on that basis compared to deciding it on the commercially different good basis? Or was that just as you were writing the brief, you thought that seemed like a good place to start or something? Okay. Two points here. Yes, our brief focuses a lot on the intended use. And that's just, not that we stress that that's the main test. That's just the way the litigation sort of came about. And we thought that that was the point that the other side, Pleasure-Way, was going to make. So if our brief focuses a lot on intended use, it doesn't mean to elevate that test above others. It's just that that's the way we thought we were going to litigate this case. Is your greatest desire here to win the case or to have the law clarified? Well, from the government's— The intended use is unclear. Right. Because we don't know from whose perspective is the intended use measured. Okay. And it makes a world of difference, right? And your view is that the intended use is as the goods come back. What was the intent to use them when they come back across the border, right? Our view, our position, is that the intended use is the ultimate intended use. That's right. In essence, yes. And the appellant's view is the intended use is the original manufacturer that made the thing, and that's the difference, right? That is their position. And if we agree with them that their intended use was just something that transports, it's the same going and coming from their perspective. From their perspective. And so should the court leave unanswered the intended use question? It can. It can leave the intended use question unanswered because if we stick with 180-164-A, I don't think you necessarily need to reach the intended use issue because we don't even get to whether something is complete or not because you would have already decided that the motorhomes are new and commercially different goods or the processes destroyed the essential characteristic. So I'm not sure this court has to reach intended use. Do you think you only get the B if you've actually passed the goods through and said, B is only used to catch things that were not having their essential characteristics destroyed or were not a new article? What's the purpose of B? The suggestion was that the purpose of B was exactly what I said as well. You're going to get through duty-free under A, but whoops, we can grab you on B. If that's the case, then if we decided in your favor on A, we couldn't reach B. The purpose of B is to ensure that it captures all sorts of products. It's not really answering my question. Well, the purpose of B is to make sure that in the commercial world you'll have, or just in the classification world, you'll have unfinished goods all the way to what you have here as a cargo van. The purpose of B is to make sure that when merchandise is imported into Canada, it's not being imported to essentially finish the product, to make something that was totally unfinished in the United States. I guess at least one way that I was trying to understand the relationship between these two things is that A says you can't be a different good, and B says, look, even if you are the same good, we really don't mean to capture, let's call them intermediate goods, things that are not really consumer end-use products, and that that's what this incomplete is about. It's taking out a category of true intermediate components where there's not yet a commercial use of the thing, aside from putting it into something else before it gets to whoever is the consumer. Right, sort of full stop. But then what I don't really understand is, and this is one reason that it seems to me at least much easier to get a grip on the commercially different good, if Pleasure Way were not the exporter, but I was the exporter, and I got a thousand sprinter vans, and I took them into Canada, and then I had an auction, and Pleasure Way bought 300 of them, and the sprinter van of Canada reseller bought another, and both of them imported back into the U.S., the vehicles, one of them having changed them, and one of them not having changed them, then I have no particular intent with respect to what the end product is. Whoever I'm going to sell them to is going to make the thing. Daimler-Chrysler intends both things, because they sell them as ready-to-use cargo vans, and they also say, by the way, you can really upfit them and make them into something else. So their intent, that is Daimler-Chrysler's intent, covers both bases. The intermediary may have no particular intent, at which point I kind of get lost in how to get a grip on unintended use in a way that I don't when I look at commercially different good. I just noticed my time, can I just point? I think the problem that you're having with intended use is because we're trying to put a viewpoint on it. If you put a viewpoint on it, it makes it impractical. If we look at the original OEM, the original— Don't you have to put a viewpoint on it? I don't think there has to be a viewpoint. In the case law, there's not a single case that states we have to look from this viewpoint or that viewpoint. It's just a basic comparison of the goods, looking at is this good the same as this good, looking at the name, the uses, the value. There's nothing about intent in the cases. And if you look at the Chevron case, which actually discusses intent, it just looks at the product. Maybe the other cases haven't dealt with this thorny little problem, but this case may present that thorny little problem. We have a regulation made by Notice and Comment Rulemaking that's governing law, and it has embedded in it the intended use. And so how does a court, how does an agency use this tool, period? I mean, even if it's a fallback use, as the presiding judge has suggested, to catch something that otherwise passed. Right. I would agree with that interpretation. But also, I think in general, we tend to look at— Well, it wasn't an interpretation. It was a lament. A lament. I agree with the lament. I was going to point out, you have just said something that surprised me when you said you don't think the point of view matters, because I think the point of view, you're taking a point of view in your position in your brief by saying it's the ultimate intended use that matters. So you are taking a point of view, the point of view of the party that's importing back into the U.S. It's the same thing. I understand what you're saying. It's sort of the same thing. I understand what you're saying. But the case law doesn't speak to view. The case law—again, the Chevron case is a perfect example. It just looks at the goods. It doesn't look at— What do you do with the hypothetical that I tried to describe, where I'm the exporter in the U.S., and I have a whole bunch of these things, and I know that some of them are going to come back into the U.S. upfitted, and some of them are going to come back with a new paint job or something, but they're still painters' or electricians' vans. I don't have it, and the people that I sell it to in Canada don't have any intent at all at the time specified in B, which is in their condition as exported. They weren't around at the time of that. Again, I understand the court's point is that, again, if you sell the vans in Canada, and some upfit, some don't, the ones that upfit and they import them back into the United States, then the regulation would apply. Again, I understand from your point that— The regulation would apply because of A. Yes. But then you say, well, but what does B do? Again, I'm not sure, and we didn't brief any of this, but a lot of times when we're looking at regulations, we want to look at something as like a checklist. We're going to come back to the presiding judge's question. You briefed this as an intended use case. Again, yes, we did brief it. You shot yourself in the foot? No, we didn't shoot ourselves. When we briefed, we were actually responding to their point. The whole thing of the pleasure waste point was intended use. The vans were complete before they were exported to Canada, so we had to respond. There was no way not to respond. The way they responded, they say their argument is irrelevant because they lose on essential characteristics or the new article, and once they lose on that, game's over. Right. But that's not how you briefed it. No, and that's a great way to do it, but we would never be able to do that. If another party addresses a point, we have to address it substantively. We can't dismiss it with one sentence. You did say that. It's just that that was the latter part rather than the front part of it. Right, right. No, that's not—in our office, that's not—trust me. We can't do that. If we could, we would. But we have to address it substantively for purposes of CIT and for purposes of preserving arguments on appeal. We will thank you for your argument. Mr. Peterson, we have five minutes. While my learned colleague was speaking, I took a look at Judge Musgrave's opinion. Now, Judge Musgrave said that these were new and different commercial articles, but you look at his opinion, he didn't distinguish them from the essential identity factors. He said they were new and different commercial articles because he felt that those essential identity factors of price, tariff, classification, use, and name had been changed. What page of the opinion are you looking at? Page 10 and page 12, which is Appendix 11 and Appendix 13 in our main brief. He says these changes created a new commercial vehicle as evidenced by changes to the pricing, the applicable tariff, vetting, the use, and the name of the vans. Now, that Dolef case you were talking about earlier, that only says that those things like changes in use, value, and et cetera, that they're not dispositive. But it doesn't say that it's improper to rely on them, right? No, but I— They're still relevant. Yeah. No, I think the question that's being asked by the panel today about this idea of a new and different commercial article, and as the courts pointed out, if you look in the regulation, it's or, you know, does not change the essential characteristics of an article or create a new and different article. Now, Judge Musgrave in the court below, he used the essential characteristic factors as his springboard for deciding there's a new and different commercial article. But Judge Toronto is right. There is an or in the regulation. Say, or create a new and different commercial article. Now, I think the question is, what would the court do if you said, you know what? Plaintiff, you're right. These factors that the judge cited are not the essential identity factors, and these operations do not change the essential identity of the goods. So we are now going to proceed to the second part of the regulation and ask, is it a new and commercially different article? Now, you could say, what parameters are you going to use for that? And frankly, Your Honors, based on the cases, that we would be in terra incognita. There has been no decision on that. There is no precedent on that which says we didn't destroy the essential characteristics of the article, but because we have a new and different commercial article. Now, you could say, well, sure, all of the essential elements of these vans are intact, the wheelbase, the engine, the name, the VIN number, the warranty. And then what's being suggested here is you could say, but it's a new and different commercial article. Okay. What's the test for that? I understand what you're saying. And there is no test. Can I ask you something a little bit slightly different, though? Sure. I mean, what would prevent the court below from having said, you know, there's three different things that we're being asked to consider here, and we are just going to rest on one of them. And we're going to say we conclude, as a matter of law, that you have to create a new commercial vehicle, period. We're not going to address the other requirements set forth in the statute because we don't have to because there are alternatives. Well, I think then what would have to happen is the court would have to rule to say once something becomes a new and different article. And standing here, a new and different commercial article, you know, if you say the essential identity characteristics. Well, you simply start by defining new. Yeah. You say, is it new if it's a cargo van one way and then it's a passenger van the next? Does that make it new? That would be a change in use. And, again, I go back to the public. No, but it would be defining the term new. Well, you could say use. You could say it's a change in classification. But, again, that's fine, and that may be factors this court says we will put into that test. All I would say is go back to the Dollef test, and the Dollef test says changes in name, changes in character, changes in size, changes in shape, and changes in use in the article, as well as classification, do not remove it from the scope of the repair and alteration test. They say they don't necessarily remove it. Again, Dollef does not say that those are not relevant things to consider. It just says that those changes are not dispositive, right? Well, they don't remove it from the scope of the provision. It doesn't say that they can't remove it. Well, I mean, they said it doesn't remove it from the scope of the provision, would unreasonably restrict the scope of the provision. And I think what the court's really saying, as I said before, this is a statute that's aimed at avoiding double taxation. The Supreme Court has said that you interpret these statutes to avoid double taxation wherever possible. This is not a statute that's to be given a strict construction. It's to be given a relatively liberal construction, I would put it to you. Where is your basis for that? The basis for that would be the Supreme Court decision in Tennessee v. Whitworth at 171 U.S. 129 from 1885. And as applied to tariff provisions, I would quote the case of Atlas Copco v. United States. That's a court of international trade case at 10 CIT 790. And they said double taxation is not ipso facto, a defective or unconstitutional exercise of power. It is not a preferred result. What the government's done here is they've essentially double taxed the vans. The vans, you know, have paid all their U.S. taxes. Their U.S. items exported. Now they're coming back in. They're being assessed with tax, the value of the splinter vans. I've got no problem with assessing a tax on all the improvements. That's baked in the cake. The more dollars on improvements, the more dollars are subject to assessment. So the question here is if the court's going to say, look, the essential characteristics are intact, but we want to deal with this new and commercial article provision in the regulation. The problem we have is to define term alterations, right? That's what the case is all about. It's all about were the goods altered? That's what the regulation keys to. Well, the regulation defines repair and alterations and includes various operations like addition, rediming. I mean, the reason why there is the no duty is these goods were sent abroad. They were altered. What do you do with the definition of alterations that we have in Richardson? Richardson binds this case in court, right? Yeah. Richardson says what was intended by the word alterations. We are of the opinion that it was not intended by the word alterations to say that it was altered. If it goes out under one classification, it comes back under another. Well, again. That's what Richardson says. Well, the problem with classification is classification is not a good identifier. Why isn't this a nice, simple way to resolve these cases? Because Richardson told us back in when was it, a long, long time ago, when they were dealing with the same, 1948, with the same problem. Were these goods altered? Because if they were altered, they come back duty free. They said alterations, it has not been altered, right? Not been altered. If the duty of classification is different coming back from what it was going out. And in this case, you agree the classification is different. You know, the problem is the inverse, Your Honor. What's wrong with the problem? We're looking here for a simple way to decide these cases. Tariff claim takes subjective intent and all those things. But, Your Honor, tariff classification is not going to be where you want to go. I mean, what do I do with the precedent that binds us? Well, in the case of motor vehicles, this court's decision in the Marabini case says the distinction between. But I'm dealing with the, I read Richardson to define the term alterations. Right. Well, in Richardson, what they said was alterations was, did not include a step in the initial production of an article. You can't alter an article before it's been made. And what that was, was that was finishing. That was, we had an unflanged wheel rim. It wasn't good for anything. We're not reading from the same part of the opinion. The part of the opinion I'm reading from talks about the classifications coming in and going out. And that's something the courts have noted. But, again, in the Dolloff case, this court said that's not dispositive. For example, if you took the example of, like, silicones, all silicones are in one tariff provision. I could send a silicone to Canada, chemically transform it into something completely new, bring it back into the country, and it would have the same tariff classification as it went out. Now, that wouldn't be an alteration. That might be a totally new chemical. But it would be in the same tariff classification. So all I'm saying, Your Honor, is if you're going to form a test for new and commercially different article that goes beyond the things enumerated in the regulation, if you're going to say the essential identity factors here are here, but it's a new and different commercial article, you're on terra incognita. You're going to have to make – I mean, there's two things you can do. You can either send the case back to the CIT and ask them for findings on it. Well, we can decide the case on intended use by agreeing with the government on whose perspective you look at for the intended use. Correct? If you say that – If we agree with them on their view of the intended use – Then nothing will ever qualify for – You lose, right? Yeah. And everyone loses. No product would ever qualify for repair and alteration because if you measure it as they do and as the court below did from the intention of the person who's performing the repairs, then nothing ever qualifies. What they're saying is if two people go into a Daimler Chrysler dealer and buy an identical Dodge Sprinter van on one day, one guy drives it off the lot and uses it as is. The other one sends it up the pleasure way to be altered. What they're saying is the guy who drove his off as is bought a finished good, but the guy who bought the identical good and sent it to Canada didn't buy a finished good. And that's a real problem because if you view it from the subjective intent of the person performing the repair, and if you say the intended use is the use as repaired or altered, well, then nothing will ever get into this provision. What it's going to be used for when it crosses the border. When it crosses the border, it can be used for carrying a van. It's still a finished article. I mean, it's an article that – Daimler Chrysler was the manufacturer. They made it. They finished it. They sold it. They're done with it. It wasn't a finished article for carrying people when it went across the border. When it came back across the border, it was finished for carrying people. You know, this court noted in the Marabini case that that's not a good distinction because any car will always carry people, even if it's a cargo car. And most vans carrying passengers will also have some cargo in it. Again, if you're coming up with a new test, I don't think tariff classification is the test. I don't think the subjective intent of the person doing the alteration is the test. Thank you very much. Thank you. The case is submitted.